## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ZEKELMAN INDUSTRIES,

**Plaintiff,**

v.

REPUBLIC OF MEXICO,

**Defendant.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff, Zekelman Industries ("Zekelman"), for its complaint against the Defendant, the Republic of Mexico, alleges as follows:

### INTRODUCTION

1.     The Mexican government is manipulating the international steel trade market to benefit itself at the expense of American interests and American steel producers. Mexico's scheme violates an international trade agreement with the United States and, in turn, substantially harms U.S. steel manufacturers, like Zekelman. As a third-party beneficiary of the agreement that Mexico has breached, Zekelman brings suit to enforce the terms of the agreement.

2.     Throughout American history, presidents from Truman to JFK to Biden have recognized that steel is central to American military preparedness and infrastructure, and that overreliance on foreign steel can put the nation at risk. Presidents from both parties have therefore taken drastic measures when necessary, and especially in times of crisis, to protect the domestic steel industry as means to

protect American interests and geopolitical standing. Because the American steel industry had been reeling from unfair foreign trade practices and imports for decades, President Trump acted.

3.    After years of increasing foreign steel imports, the U.S. domestic steel industry and our national security were at serious risk. So, in 2018, President Trump imposed steel tariffs under Section 232 of the Trade Expansion Act of 1962. The President implemented those tariffs to protect the domestic steel industry from oversupply of foreign steel imports, which in turn—as his administration correctly understood—would bolster U.S. national security and critical infrastructure.

4.    Mexico, on the other hand, wanted to avoid the 2018 tariffs. So, in return for the U.S. lifting the tariffs on Mexico, Mexico agreed to jointly implement measures that would limit steel exports to historical levels and ensure an adequate trade balance. *See* Joint Statement by the United States and Mexico on Section 232 Duties on Steel and Aluminum (May 17, 2019) ("2019 Agreement"). In other words, the agreement would maintain the pre-2018 tariff status quo and ensure that the lifting of the tariffs would *not* undermine the domestic steel industry or recreate the same national security risks that had existed before 2018.

5.    But Mexico had other plans and commercial interests adverse to the international agreement it had just signed.

6.    Almost immediately after Mexico entered the 2019 Agreement, the level of Mexican steel exports to the U.S. *skyrocketed*. Mexico violated its obligations under

the 2019 Agreement, and the level of Mexican steel imports far exceeded the pre-2018-tariff import levels:

| Steel Product | Benchmark Period | 2021 Imports | 2022 Imports | 2023 Imports |
|---|---|---|---|---|
| Total Steel Mill Products | 2.8M | 4.3M | 4.8M | 3.8M |
| Year-over-Baseline | N/A | 154% | 171% | 136% |

7.     Mexico's violations were deliberate: it is subsidizing and facilitating those exports to the U.S. With low worker wages, cheap production costs, and lax oversight, Mexico can rapidly scale steel production, over-produce steel products, and then dump excess steel into U.S. markets—all while avoiding the tariffs that were meant to prevent these unfair trade practices.

8.     Although Mexico entered the 2019 Agreement as a sovereign, Mexico has breached the agreement in its capacity as a commercial actor. For that reason, Mexico is not entitled to sovereign immunity. Rather, it is a market participant for purposes of this lawsuit. And because it has directly and severely injured the intended beneficiaries of the agreement, like Zekelman, those beneficiaries have standing to sue it.

9.     Mexico's breach of the 2019 Agreement has devastated the U.S. steel industry. Zekelman has been forced to close two plants because of the oversupply of cheap, foreign steel. Zekelman and its employees are suffering financially, and many jobs have already been lost or are now at risk. Mexico's breach of the 2019 Agreement is undercutting U.S. steel and creating a domestic-infrastructure and national-

security threat. With no remedial action being taken by our government, Zekelman has no choice but to pursue legal remedies and enforce its rights in this Court.

10.     The Court should therefore remedy the breach and enforce the terms of the 2019 Agreement.

## PARTIES

11.     The Plaintiff, Zekelman Industries ("Zekelman"), is a domestic manufacturing corporation headquartered in Chicago, Illinois.

12.     Zekelman is comprised of family-owned companies and has a long and storied history, dating back to 1877.

13.     The family of operating companies that make up Zekelman include Atlas Tube, Picoma, Sharon Tube, Wheatland Tube, Western Tube, and Z Modular.[1]

14.     Zekelman is the largest independent steel pipe and tube manufacturer in North America, and the leading innovator in multi-family housing development.[2]

15.     Zekelman has twenty manufacturing locations and 2,900+ employees across North America.[3]

16.     The Defendant, The Republic of Mexico ("Mexico"), is a foreign state and, at all relevant times, a commercial actor in the steel market.

---

[1] Zekelman, *Zekelman Industries Introduces New Rally Cry: BELIEVE IN WHAT YOU BUILD*, ZEKELMAN.COM, (Jan. 17, 2024), https://www.zekelman.com/news/zekelman-industries-introduces-new-rally-cry-believe-in-what-you-build/.

[2] Zekelman, *About Us*, ZEKELMAN.COM, https://www.zekelman.com/company/about-us/ (last visited Oct. 21, 2024).

[3] *Id.*

4

## JURISDICTION

17.    The Court has jurisdiction over this matter under 28 U.S.C. § 1330(a) and § 1605(a)(2), the Foreign Sovereign Immunities Act ("FSIA").

18.    While the FSIA establishes a presumption of immunity for foreign governments, that immunity is subject to several exceptions. Most relevant here, the FSIA includes a "commercial activity exception" to immunity.

19.    The "commercial activity exception" states that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States . . . in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2).

20.    Additionally, the "commercial activity exception" applies if the action the foreign state is based "upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." *Id.*

21.    This Court has jurisdiction over Mexico because Mexico carried out "commercial activity" in the United States and because that activity caused a "direct effect" in the United States. Mexico therefore does not have sovereign immunity under the FSIA.

22.    The Court also has personal jurisdiction over Mexico under 28 U.S.C. § 1330. *See TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296, 299 (D.C. Cir. 2005) ("The FSIA confers upon district courts subject matter jurisdiction as to 'any claim for relief in personam with respect to which the foreign state is not entitled

to immunity,' and personal jurisdiction follows where proper 'service has been made under § 1608.'" (quoting 28 U.S.C. § 1330(a), (b))); *see also Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1548 n. 11 (D.C. Cir. 1987) ("[U]nder the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction").

## VENUE

23.     Venue is proper in this Court because "[a] civil action against a foreign state as defined in section 1603(a) of this title may be brought . . . in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof." 28 U.S.C. § 1391(f)(4).

## FACTUAL BACKGROUND

### I.     Domestic steel producers, like Zekelman, are vital to U.S. national security.

24.     A strong domestic steel industry is vital to U.S. national security.

25.     Throughout American history, steel has been the backbone of American military preparedness. From the Minutemen's steel bayonets in the Revolutionary War to twenty-first century Patriot missiles, steel is and has been an essential building block of nearly all American military weaponry, infrastructure, and installations.

26.     According to the U.S. Department of Commerce, "[s]teel articles are critical to the nation's overall defense objectives."[4] Indeed, the Department of Defense

---

[4] U.S. Dep't of Commerce, *The Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended* 23 (Jan. 11, 2018) ("2018 Commerce Report"),
https://www.commerce.gov/sites/default/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf.

6

currently requires approximately three percent of domestic U.S. steel product to meet national defense needs.[5]

27.     For those reasons, U.S. national security is at great risk when the U.S. relies too heavily on foreign-imported steel and must depend on foreign actors (with potentially adverse interests) to supply steel, especially in times of geopolitical conflict.

28.     When domestic steel is strong, America is strong.

29.     Because U.S. defense needs are so diverse, no single domestic steel producer could supply the entirety of steel needed for national defense. Rather, domestic steel producers must attract sufficient commercial, non-defense business to meet these needs while also keeping their doors open.

30.     According to the Department of Commerce, non-defense "commercial revenue supports construction, operation, and maintenance of production capacity as well as the upgrades, research and development required to continue to supply defense needs in the future."[6]

31.     In addition to supporting national security, steel is vital to domestic infrastructure, including transportation and energy.

32.     In turn, a healthy domestic steel industry is critical for the American economy to be able to thrive. Domestic steel is needed "to satisfy requirements for

---

[5] *Id.*

[6] *Id.*

those industries the U.S. Government has determined are critical to minimum operations of the economy and government."[7]

33.     Perhaps the most important role that steel plays is in the transportation and energy sectors.

34.     Because of steel's strength and durability, it is resistant not only to regular wear but also to extreme weather, making it the ideal component for transportation infrastructure. From highways to bridges to railroads to airports, steel connects all Americans.

35.      Steel also supports and strengthens American energy. Pipelines, transmission wire, storage tanks, and drilling equipment are all produced with steel.

36.     As the U.S. transitions into renewable energy, particularly wind powered turbines, millions of additional tons of steel will be needed to meet infrastructure needs.

37.     The domestic steel industry has also served as the backbone of American communities and economies for generations.

38.     According to the American Iron and Steel Institute, "[t]he iron and steel industry is a dynamic part of the U.S. economy, generating more than $520 billion in total economic output and nearly two million American jobs in 2017. These jobs paid over $131 billion in wages and benefits."[8]

---

[7] *Id.* (internal quotation marks and citation omitted).

[8] AM. IRON & STEEL INST., THE ECONOMIC IMPACT OF THE IRON & STEEL INDUSTRY 2 (2018).

39.     Because steel is essential to both national security and domestic infrastructure, the U.S. government has taken numerous steps throughout history to protect a readily available supply of domestic steel.

40.     For example, as early as the 1790s, Congress imposed tariffs on imported steel horseshoes, nails, and rifle barrels, all necessary for national defense, to ensure these products were made with domestic steel.[9]

41.     During the Korean War, President Truman seized domestic steel production facilities to ensure unfettered production in the face of a nationwide steel worker strike.[10]

42.     According to the Supreme Court, "[t]he indispensability of steel as a component of substantially all weapons and other war materials led the President to believe that the proposed work stoppage would immediately jeopardize our national defense and that government seizure of the steel mills was necessary in order to assure the continued availability of steel."[11]

43.     While the Court in *Youngstown* held that the seizure exceeded the President's constitutional authority, President Truman's actions show that strong domestic steel is and always will be critical to America's national defense.

---

[9] John Ydstie, *Protection For the Steel Industry is as Old as America*, NPR (April 24, 2018), https://www.npr.org/2018/04/24/604369759/protection-for-the-steel-industry-is-as-old-america.
[10] *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).
[11] *Id.* at 582.

44.     So too do the actions of Truman's successors. From John F. Kennedy to Joe Biden, Presidents have routinely taken action to benefit domestic steel producers and workers, to protect U.S. national security.[12]

## II.     Excess imports of foreign steel weaken domestic steel producers and threaten U.S. national security.

45.     For decades, global steel markets have been plagued by chronic overcapacity. Both the basic economics of steel production and anti-competitive policies pursued by major steel producing countries have created significantly more steel supply vis-à-vis demand.

46.     This overcapacity places downward pressure on global steel prices as producers seek to offload their excess supply in foreign markets.

47.     For years, this resulting influx of cheap, foreign steel in domestic markets has decimated the U.S. steel industry.

48.     Because of increasing steel imports and high import penetration, an increasing portion of domestic steel demand was being met by imported foreign steel.

49.     By 2016, "U.S. imports of steel products, which displace demand for domestic steel and lower production at U.S. plants, reached nearly four times the level of exports of U.S. steel products."[13]

---

[12] *See, e.g.*, FACT SHEET: President Biden Takes Action to Protect American Workers and Businesses from China's Unfair Trade Practices (May 14, 2024), https://www.whitehouse.gov/briefing-room/statements-releases/2024/05/14/fact-sheet-president-biden-takes-action-to-protect-american-workers-and-businesses-from-chinas-unfair-trade-practices/ (noting that "[s]teel is a vital sector for the American economy, and American companies are leading the future of clean steel," but that "American workers continue to face unfair competition from China's non-market overcapacity in steel and aluminum").

[13] 2018 Commerce Report at 30.

50.     All of this placed the domestic steel industry in dire financial straits. As a whole, the U.S. steel industry operated at a net loss from 2009–16.[14] These losses forced U.S. producers to defer or eliminate investments in production facilities and research and development.[15] And many producers amassed substantial debt with no clear path to paying it down due to decreasing demand of domestic steel.[16]

51.     These years of running on losses or minimal profits, in the face of increasing waves of steel imports, severely weakened the financial footing of an industry essential to national security.

### III.   The President imposes tariffs on foreign steel to protect domestic steel producers and national security.

52.     In 2018, against this backdrop—and in line with America's long tradition of protecting domestic industries vital to national security—President Trump imposed tariffs to protect the U.S. steel industry.

53.     In Section 232 of the Trade Expansion Act of 1962, Congress authorizes the President to investigate and "take action to adjust imports of an article and its derivatives" if "an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." 19 U.S.C. § 1862(c).

---

[14] *Id.* at 37.

[15] *Id.* at 38.

[16] *Id.*

54.     On March 15, 2018, President Trump exercised his Section 232 authority to protect domestic steel producers and U.S. national security from excess imports of foreign steel.

55.     Agreeing with Commerce's finding that steel mill articles were being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States, President Trump imposed a 25 percent tariff on steel mill articles and a 10 percent tariff on aluminum articles imported from most countries.[17]

56.     The purpose of President Trump's tariffs was to protect U.S. manufacturers from "the persistent threat of further closures of domestic steel production facilities" that would in turn impair America's "ability to meet national security production requirements in a national emergency."[18]

## IV.     Mexico agrees to limit steel exports to the U.S. in exchange for tariff relief.

57.     Mexico was upset by the imposition of the steel tariffs and sought an exemption from it.

58.     Accordingly, in May 2019, the United States and Mexico reached an agreement in which the United States would suspend all tariffs imposed under Section 232 on steel and aluminum products from Mexico. In exchange, Mexico agreed to jointly "implement measures to . . . [p]revent the importation of aluminum and steel that is unfairly subsidized and/or sold at dumped prices" and to "[p]revent the

---

[17] Presidential Proclamation 9705 (Mar. 15, 2018).

[18] *Id.*

transshipment of aluminum and steel made outside of Mexico" into the United States. *See* Joint Statement by the United States and Mexico on Section 232 Duties on Steel and Aluminum, ¶ 3 (May 17, 2019).

59.     The "dumping" referenced in the 2019 Agreement is a practice by which foreign producers sell a product in the United States at a price that is below that producer's sales price in the producer's home country or at a price lower than the cost of production.[19]

60.     A "countervailable subsidy" is a subsidy by a foreign government by which the government subsidizes its domestic industries by providing financial assistance to benefit the production, manufacturing, and exportation of certain goods.[20]

61.     After the 2019 Agreement, the U.S. Trade Representative stated that the U.S. steel industry was meant to directly benefit from this agreement, noting that the agreement "will continue to protect America's steel and aluminum industries."[21]

## V.     Mexico breaches its agreement by dumping steel into U.S. markets.

62.     Mexico has not honored its end of the bargain. Instead, it is actively violating the terms of the 2019 Agreement.

---

[19] International Trade Administration, *An Introduction to U.S. Trade Remedies*, ENFORCEMENT.TRADE.GOV, https://enforcement.trade.gov/intro/index.html#:~:text=Dumping%20occurs%20when%20a%20foreig n,than%20the%20cost%20of%20production (last visited Oct. 21, 2024).

[20] *Id.*

[21] United States Announces Deal with Canada and Mexico to Lift Retaliatory Tariffs (May 17, 2019), https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/may/united-states-announces-deal-canada-and.

63.    In direct violation of the 2019 Agreement, Mexico *increased* its steel exports to the United States dramatically—to *72 percent above* their 2015–17 averages.[22]

64.    While shipments from Mexico largely declined in 2020, steel shipments from Mexico increased dramatically by 2021, well surpassing the 2018 levels that triggered the initial Section 232 tariffs.

**Figure 1:** *Total U.S. Steel Product Imports from Mexico - Volume*[23]



65.    As seen in Figure 2, in 2022, Mexican steel imports surged to almost twice the benchmark level (defined as the 2.8M in total volume from 2015–17)—over

---

[22] *U.S. Senators introduce bill to reimpose 25% tariff on Mexican steel imports*, S&P Global, https://www.spglobal.com/commodityinsights/en/market-insights/latest-news/metals/070723-us-trade-representative-asks-mexico-to-address-increased-steel-aluminum-imports (last visited July 18, 2024).

[23] Andrew Rechenberg, *Mexico's Violation of Steel Import Agreement is Threatening Local U.S. Economies*, COALITION FOR A PROSPEROUS AM. (Apr. 15, 2024) (collecting data Steel Import Monitoring and Analysis (SIMA) and U.S. Department of Commerce, Enforcement and Compliance), https://prosperousamerica.org/mexicos-violation-of-steel-import-agreement-is-threatening-local-u-s-economies/.

a 171 percent increase. While imports dropped slightly from 2022 to 2023, preliminary 2024 import data suggests that Mexican steel imports has increased again in 2024.

**Figure 2: *Mexican Steel Imports Each Year vs. Benchmark*[24]**

| Steel Product | Benchmark Period | 2021 Imports | 2022 Imports | 2023 Imports |
|---|---|---|---|---|
| Total Steel Mill Products | 2.8M | 4.3M | 4.8M | 3.8M |
| Year-over-Baseline | ____ | 154% | 171% | 136% |

66.     When broken down by product, the increases in violation of the 2019 Agreement are particularly staggering. In 2023, steel conduit imports from Mexico more than doubled the baseline value. Moreover, products in the category "Other structures and parts of structures" were imported at almost *three times* the benchmark.

---

[24] *Id.*

**Table 3:** *Volume of Selected Steel Products Imported from Mexico*[25]

| **Steel Product** | 2015-2017 | 2021 Imports | 2022 Imports | 2023 Imports | 2020 over Baseline |
|---|---|---|---|---|---|
| [Steel Conduit] Other tubes, pipes, and hollow profiles, internally coated or lined (not exceeding 114.3 mm) (HTS 7306.30.5028) | $13.6M | $55.8M | $68.9M | $53.9M | 295% |
| Flat-rolled products (width of 600 mm or more, hot-rolled) (HTS 7208) | $168.2 | $436.1M | $736.6M | $298.5M | 77% |
| Wire of stainless steel (HTS 7223) | $0.6M | $0.2M | $2.6M | $3.0M | 412% |
| Other structures and parts of structures (HTS 7308) | $519.9M | $1,306.9M | $1,879.6M | $1,806.3M | 247% |
| Semifinished products of iron (HTS 7207) | $218.7M | $745.4M | $680.0M | $443.9M | 103% |
| Other tubes, pipes and profiles (HTS 7306) | $350.5M | $510.1M | $717.6M | $607.8M | 73% |

67.     The trend of surging steel conduit imports from Mexico is also clear when looking at total import volume in additional total value. Current steel conduit import volume from Mexico is 303 percent above the baseline average from 2015–17. The below graph also shows how the steel conduit import surge from Mexico has gotten even worse in 2024. Total steel conduit import volume from Mexico is up 87 percent from December 2023 to July 2024.

---

[25] *Id.* (collecting data from U.S. Census Bureau (General Customs Value)).

**Figure 3:** *U.S. Steel Conduit Imports from Mexico Surging*



68.    Moreover, evidence suggests that the true surge of steel conduit imports is underreported in official import declarations due to intentional misclassification and misreporting.

69.    The official steel conduit import surge above the 2015–17 baseline from Mexico is 303 percent, according to U.S. Census data. However, Bill of Lading data—not as prone to the misclassification problems—suggests that import volume from Mexico of items matching the steel conduit product description are up 500–700 percent above the historic baseline.

**Figure 4:** *Steel Conduit Imports from Mexico (Bill of Lading Data)*[26]



70.     Mexico is therefore in breach of the 2019 Agreement because it required Mexico to "implement effective measures to . . . [p]revent the importation of . . . steel that is unfairly subsidized and/or sold at dumped prices." 2019 Agreement ¶ 3.a.

71.     Mexico has not implemented such measures but has instead engaged in a practice of *facilitating* the dumping of steel in the United States.

72.     Mexico facilitates dumping because, as a commercial participant in the steel market, it benefits from the dumping of steel.

73.     For one, Mexico has historically been a majority shareholder in some of the largest steel manufacturers in Mexico.

---

[26] Data obtained from Panjiva Global Trade Insights, https://panjiva.com/.

74. As such, Mexico stands to gain substantial benefits by (1) helping companies evade the 2018 tariffs, and then (2) turning around and dumping steel into the U.S. market.

75. Second, Mexico develops the infrastructure and technology that facilitates the exportation of Mexican steel into the United States.[27] Accordingly, the higher volume of export there is, the more that Mexico profits from the use of its infrastructure.

76. Third, Mexico benefits by subsidizing the production, manufacturing, and exportation of steel through what are called "countervailable subsidies."

77. In January 2020, the United States Department of Commerce issued a notice entitled "Certain Fabricated Structural Steel From Mexico: Final Affirmative Countervailing Duty Determination," *see* 85 Fed. Reg. 5381, Jan. 30, 2020), which concluded that Mexico was providing countervailable subsidies to certain producers and exporters of steel through, in part, Mexico's "Eighth Rule" permit process.[28]

78. Today, Mexico continues its subsidy program, and it has chosen not to implement any measures to reduce dumping or to reduce steel exports into the United States.

---

[27] Cabaro Group, *Mexico: A Major Player in Steel Production*, BLOG.CABARO-GROUP.COM (Feb. 17, 2024), https://blog.cabaro-group.com/mexico-a-major-player-in-steel-production/.

[28] "Under the Eighth Rule permit process, developed in 1972, the Mexican Secretariat of Economy authorizes companies to temporarily or permanently import materials, inputs, machinery and other production-process items without the payment of duties; companies that receive the permit may subsequently export the finished products.  In other words, this is a variation of duty drawback schemes[.]" Alejandro Nemo Gomez Strozzi, Gregory Husisian, *The Eighth Rule: Permit a Staple Mexico*, JD Supra (Oct. 18, 2024), https://www.jdsupra.com/legalnews/the-eighth-rule-permit-a-staple-mexico-91201/.

79.     Mexico's breach has not gone unnoticed by American politicians. In a letter to the Biden Administration, Ohio Senator Sherrod Brown stated that the "unsustainable surge of Mexican steel imports into the U.S. market" constitutes a "violation of the 2019 Joint Agreement on Steel and Aluminum."[29]

80.     As Senator Brown noted, "imports are 472 percent over the historic baseline. Trade data also shows that Mexico is on pace to ship more than three times its historic volumes of corrosion-resistant steel to the United States in 2024."[30]

81.     In sum, as a commercial actor, Mexico has facilitated exports of its steel into the U.S. for its own economic gain and the gain of its state-majority-owned steel companies, in knowing violation of the 2019 Agreement.

**VI.     Mexico's breach has harmed Zekelman.**

82.     Mexico's breach has harmed the U.S. steel industry, and Zekelman in particular.

83.     Despite the initial boost in the U.S. steel industry provided by the 2018 Section 232 tariffs, continuing problems with unlimited imports from countries like Mexico have rocked investment and caused stagnation.

84.     According to the Center for A Prosperous America, U.S. steel companies "have hundreds of millions of dollars of investment in new plants or production lines

---

[29] Letter from Sen. Sherrod Brown to Ambassador Katherine Tai and National Security Advisor Jake Sullivan (June 25, 2024),
https://www.brown.senate.gov/imo/media/doc/mexican_steel_surge_letter.pdf

[30] *Id.*

on hold because the U.S. market will not support both a Mexico import surge and increased domestic production."[31]

85.    Employment data from the steel industry reflects this stagnation, with some marked drops in employment rates.

86.    For example, in February 2024, the three-month growth in steel manufacturing employment decreased by nearly 2 percent. In March 2024, the three-month growth dipped to -2.1 percent. In April 2024, it hovered at -1.5 percent. Total steel product manufacturing employment is down by 600 jobs in the first half of 2024 alone.[32]

---

[31] Andrew Rechenberg, *Mexico's Violation of Steel Import Agreement is Threatening Local U.S. Economies*, Coalition for a Prosperous Am. (Apr. 15, 2024), https://prosperousamerica.org/mexicos-violation-of-steel-import-agreement-is-threatening-local-u-s-economies/.

[32] U.S. Bureau of Labor Statistics, *Employment for Manufacturing: Steel Product Manufacturing from Purchased Steel (NAICS 3312) in the United States*, FED. RESERVE OF ST. LOUIS: FRED ECONOMIC DATA (last updated Apr. 26, 2024), https://fred.stlouisfed.org/series/IPUEN3312W200000000.

**Figure 8:** *Three-Month % Change in Employment in Steel Product Manufacturing from Purchased Steel (2020-Present)*



87.    The decline in steel employment has been accompanied by a corresponding and substantial drop in domestic steel output.

88.    In 2019, U.S. domestic steel production was at 87.8 million metric tons annually. By 2023, this production output dropped to 80 million metric tons—a 9 percent total drop.

89.    This drop in total production also represents a substantial loss in potential revenue for the U.S. steel industry. This 7.8 million metric tons production loss amounts to a $5.5–$8.9 billion annual revenue loss for the total domestic steel industry depending on current steel prices.[33]

---

[33] *HRC Steel*, TRADING ECON. (last updated Oct. 2, 2024), https://tradingeconomics.com/commodity/hrc-steel.

90.     Along with other members of the steel industry, Zekelman has felt the drastic effects of Mexico's breach.

91.     The influx of Mexican steel conduit has already forced Zekelman to close two facilities that primarily produced steel conduit.

92.     On September 10, 2024, Zekelman announced the forced closure of its facility on Chicago's Southwest Side. This closure follows the 2022 closure of Zekelman's Long Beach, California mill.

93.     The two closures resulted in a combined loss of hundreds of high-paying American jobs.

94.     As Zekelman explained at the time, "[a] contributing factor in the closure of the Long Beach factory is the surge of imported steel conduit from Mexico."[34] The same was true for its Chicago factory, where Mexico's breach caused the layoff of over 230 employees.[35]

## VII.   Zekelman is an intended beneficiary of the 2019 Agreement.

95.     Zekelman's injury, caused by Mexico's breach, entitles Zekelman to sue Mexico as a third-party beneficiary of the 2019 Agreement.

---

[34] Zekelman, *Zekelman Industries announces closure of factory in Long Beach, California*, ZEKELMAN.COM (Oct. 5, 2022), https://www.zekelman.com/news/zekelman-industries-announces-closure-of-factory-in-long-beach-california/.

[35] Mike Hockett, *Pipe Maker Zekelman Blames Mexico Imports for Chicago Plant Closure*, MDM DISTRIBUTION INTELLIGENCE (Sept. 12, 2024), https://www.mdm.com/news/top-distributor-sectors/industrial-pvf/pipe-maker-zekelman-blames-mexico-imports-for-chicago-plant-closure/.

96.     The 2019 Agreement is a contract, even though it is one entered into between two nations. As such, it entitles a third-party beneficiary rights to sue under traditional contract law.

97.     In this case, Zekelman and other U.S. manufacturers were intended third-party beneficiaries of the 2019 Agreement, based on the implied intent of the U.S. and Mexico and the surrounding context.

98.     At the outset, the tariffs imposed on Mexico in 2018 were specifically intended to protect U.S. steel manufacturers, like Zekelman.

99.     As noted, President Trump wanted to ensure they did not face "the persistent threat of further closures of domestic steel production facilities" that would in turn impair America's "ability to meet national security production requirements in a national emergency."[36]

100.    President Trump later touted the tariffs as part of his effort to "to protect our vital industries and support our national security."[37]

101.    The United States then agreed to lift tariffs for Mexico—but *only if* Mexico agreed to terms that would still limit its exports of steel to the United States to reasonable levels.

102.    Against that backdrop, the May 2019 Agreement was meant to benefit the U.S. Steel Industry, and the U.S. companies such as Zekelman, who make up that market.

---

[36] *Id.*

[37] The White House, Economy & Jobs, TRUMPWHITEHOUSE.ARCHIVES.GOV, https://trumpwhitehouse.archives.gov/issues/economy-jobs/ (Last visited Oct. 21, 2024).

103.    Indeed, when the Office of the U.S. Trade Representative announced the 2019 Agreement, it acknowledged that an intended third-party beneficiary was the U.S. steel industry, stating: "the Agreement will continue to protect America's steel and aluminum industries."[38]

104.    Zekelman is thus a third-party beneficiary to the 2019 Agreement, with standing to sue.

## **CAUSE OF ACTION**

### **Breach of the 2019 Agreement**

105.    The 2019 Agreement included a bargained for exchange for consideration: The United States agreed to lift certain tariffs, and in exchange, Mexico was required to jointly "implement effective measures to . . . [p]revent the importation of . . . steel that is unfairly subsidized and/or sold at dumped prices." 2019 Agreement ¶ 3.a.

106.    Mexico has breached the 2019 Agreement by intentionally facilitating the dumping of steel into America and harming the third-party beneficiaries of the 2019 Agreement, domestic steel companies, including Zekelman.

107.    Mexico caused the breach through its subsidies of its steel industries, its legal and actual control over exports and the steel companies, and its facilitation of the dumping.

---

[38] *See* Office of the U.S. Trade Rep., United States Announces Deal with Canada and Mexico to Lift Retaliatory Tariffs, (May 17, 2019) https://ustr.gov/about-us/policy-offices/press-office/press-releases/2019/may/united-states-announces-deal-canada-and.

108.    Zekelman was one of the intended beneficiaries of the 2019 Agreement because the 2019 Agreement was meant to benefit the U.S. Steel Industry. The Office of the U.S. Trade Representative made it clear that an intended third-party beneficiary was the U.S. steel industry's members, stating: "the Agreement will continue to protect America's steel and aluminum industries."[39]

109.    Zekelman has experienced significant monetary damages, including the closing of a mill, layoffs, decisions not to invest, and other financial decisions decreasing revenue directly caused by the dumping of the steel.

110.    Mexico was the cause of Zekelman's injuries. But for Mexico's breach and flooding of the U.S. domestic steel market with cheap steal, Zekelman would have hired more employees, opened new plants, and made more economic gains on domestically manufactured steel. And but for Mexico's breach and flooding of the U.S. domestic steel market with cheap steal, Zekelman would not have closed its factories in Long Beach, California, and Chicago, Illinois, laid off hundreds of workers, and lost millions of dollars in annual profit.

---

[39] *See* Office of the U.S. Trade Rep., United States Announces Deal with Canada and Mexico to Lift Retaliatory Tariffs, (May 17, 2019), *supra.*

## <u>RELIEF REQUESTED</u>

WHEREFORE the Plaintiff, Zekelman Industries, seeks:

    a.  Monetary damages for lost profits;

    b.  Monetary damages for plant closures;

    c.  Indemnification for third-party lawsuits due to Zekelman's inability to produce and/or sell steel;

    d.  Specific performance of the 2019 Agreement;

    e.  Any other relief the Court deems appropriate.

Dated: October 21, 2024                    Respectfully submitted,


                                           /s/ *Edward M. Wenger*
Drew Ensign                                Edward M. Wenger
D.C. Bar No.                               D.C. Bar No. 1001704
HOLTZMAN VOGEL BARAN                       Erielle Davidson
TORCHINSKY & JOSEFIAK                      D.C. Bar No.
2555 East Camelback Rd                     Oliver Roberts
Suite 700                                  *Pro Hac Vice Forthcoming*
Phoenix, AZ 85016                          HOLTZMAN VOGEL BARAN
densign@HoltzmanVogel.com                  TORCHINSKY & JOSEFIAK
Phone: (602) 388-1262                      2300 N Street NW,
                                           Suite 643
                                           Washington, D.C. 20037
                                           emwenger@HoltzmanVogel.com
                                           edavidson@HoltzmanVogel.com
                                           oroberts@HoltzmanVogel.com
                                           Phone: (202) 737-8808

Mark Pinkert                               Caleb Acker
*Pro Hac Vice Forthcoming*                 D.C. Bar. No.
HOLTZMAN VOGEL BARAN                       HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK                      TORCHINSKY & JOSEFIAK
119 S. Monroe Street                       15405 John Marshall Hwy
Suite 500                                  Haymarket, VA 20169
Tallahassee, FL 32301                      cacker@HoltzmanVogel.com
mpinkert@HoltzmanVogel.com                 Phone: 540-341-8808
Phone: 850-270-5938